IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RESEARCH AUTOMATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> SCHRADER-BRIDGEPORT INTERNATIONAL, INC., <br><br> Defendant. | Case No.: 09-cv-01265 <br><br> (Hon. Joan B. Gottschall) |
| SCHRADER-BRIDGEPORT INTERNATIONAL, INC., <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> RESEARCH AUTOMATION, INC., <br><br> Counterclaim-Defendant. | |

## SCHRADER-BRIDGEPORT INTERNATIONAL, INC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO TRANSFER VENUE

Defendant and Counterclaim-Plaintiff Schrader-Bridgeport International, Inc. ("SBI"), by counsel, pursuant to Local Rule 7.1, in support of its Motion to Transfer Venue to the United States District Court for the Western District of Virginia, Lynchburg Division, submits the following memorandum.

I. **Introduction**

This case stems from Research Automation, Inc.'s ("RAI") failure to produce a large industrial machine for SBI's Virginia facility as promised pursuant to RAI's contract with SBI. RAI fell woefully behind the delivery date specified in the contract, and, despite the delay, the

machine still failed to perform as promised. As a result, in 2007, SBI filed a breach of contract suit against RAI in Virginia. SBI provided RAI with a copy of the complaint but agreed to withhold service while the parties pursued a plan to resolve the dispute. Extensive and prolonged negotiations produced an amendment to the contract, which gave RAI yet another chance to deliver the machine it had promised. During the recent tests of the machine, it became clear that the machine still failed to perform as required.

Before the tests were finished, knowing that SBI already had filed suit in Virginia, RAI raced to the Keene County, Illinois, courthouse and sued SBI. For the reasons discussed below, this case should be transferred to the U.S. District Court for the Western District of Virginia, where it can be consolidated with SBI's refiled suit. Transfer is warranted not just because the 28 U.S.C. § 1404(a) factors are satisfied, but also because it is a proper remedy to RAI's forum shopping and preemptive litigation tactics.

Virginia is the *situs* of material events, including the negotiation of the subject agreement and the most important testing of the subject cleaning machine. The key evidence in this case – the large machine and the parts used to test the machine – is located in Virginia. Virginia is also a more convenient venue for numerous material witnesses, including SBI's current and former employees and Paschal's representatives in North Carolina. Finally, transfer to Virginia will promote judicial economy and avoid inconsistent rulings by different courts, and it will discourage future litigants from engaging in forum shopping and procedural gamesmanship. Therefore, for the convenience of material witnesses, because of the ease of access to material evidence, and in the interest of justice, this action should be transferred to the Western District of Virginia.

## II. Factual Background

### A. RAI and Paschal Agree to Supply SBI with a Custom High Pressure Washer

SBI is a Delaware corporation with its principal place of business in Altavista, Virginia. *See* Exhibit 1, Affidavit of Keith Letz (hereinafter, "Letz Aff."), ¶ 3. SBI designs, manufactures and distributes automotive parts from its facilities in Virginia, including three families of valves and tire stems referred to as M-8's, M-10's, RPTM's (the "Parts"). *Id.* at 4. Prior to distribution, the Parts must be washed and deburred of chips, slivers and other debris. *Id.* Currently, the Parts are washed, in bulk, using a machine. *Id.* After the bulk washing process, employees manually inspect each individual Part using a magnifying glass and, if necessary, deburr the individual Parts using a pick and an air nozzle. *Id.* SBI's current process is both practically and economically inefficient. *Id.*

Paschal Associates, Inc. ("Paschal") is a North Carolina corporation with its principal place of business in Asheboro, North Carolina, approximately 135 miles from SBI's Virginia facility. *See* Exhibit 2, Excerpts from Paschal's Website. Paschal is in the business of, *inter alia*, supplying manufacturers with metal finishing and cleaning equipment. *Id.* In late 2004, early 2005, SBI contacted Paschal about acquiring a machine that could more efficiently deburr and clean SBI's automotive parts. Ex. 1, Letz Aff., ¶ 5. Paschal recommended RAI. *Id.* RAI is an Illinois corporation that designs and manufactures custom automation machinery and systems. *Id.*; *see also* Exhibit 3, Excerpts from RAI's Website. Furthermore, "Water Jet Deburring" machines are among the types of machines that RAI custom manufactures. *See* Ex. 3.

In late 2005, Don Helms ("Helms"), Paschal's Metal Finishing and Cleaning Sales representative, and Steve Arbizzani ("Arbizzani"), President of RAI, met with representatives of SBI at SBI's facilities in Altavista, Virginia. Ex. 1, Letz Aff., ¶ 6. At that meeting, SBI

3

explained that it needed a high pressure washer that could clean and deburr its Parts with zero changeover time between washes. *Id.* Arbizzani represented that RAI could build a machine that satisfied SBI's needs and specifications. *Id.*

Over the next several months, SBI corresponded and communicated with Paschal and RAI about the specifications of the desired machine. RAI sent several revised quotes directly to SBI setting forth the terms upon which it would agree to build the requested machine, as well as the dimensions and general design of the machine itself. *Id.* at ¶ 7. On March 23, 2006, SBI, RAI and Paschal Associates, Inc. ("Paschal") entered into an agreement (the "Agreement") by which Paschal and RAI promised to supply SBI with a high pressure washer (the "Machine") capable of cleaning and deburring small automotive parts that SBI manufactures in Virginia. *Id.* The Agreement required the Machine to meet certain specifications and to be delivered on or before October 6, 2006. *Id.* at ¶ 8. SBI has paid more than $250,000, representing 50% of the purchase price. *Id.*

Representatives of SBI traveled to RAI's facilities between October 2006 and March 2007 to oversee RAI's run-off of the Machine. *See* Exhibit 4, Affidavit of Douglas Sherwood (hereinafter, "Sherwood Aff."), ¶ 3. On each occasion, the Machine failed to perform as promised. *Id.* On July 19, 2007, Helms and Arbizzani returned to SBI's office in Virginia to discuss SBI's concerns about RAI's ability to build the Machine in conformance with SBI's specifications. *Id.* at ¶ 4. Helms and Arbizzani again assured SBI that RAI could build the Machine to SBI's specifications. *Id.* at ¶ 5.

### B. SBI Files Suit In Virginia But Agrees To Withhold Service To Facilitate An Out-Of-Court Resolution

Despite Helms' and Arbizzani's assurances, RAI and Paschal failed to supply a Machine in conformance with the agreed specifications. As a result, on November 16, 2007, SBI filed suit

4

against RAI and Paschal in the Circuit Court for Campbell County, Virginia, styled *Schrader-Bridgeport International, Inc. v. Paschal Associates, Inc., et al.*, Case No. CL07000497-00. SBI provided a copy of its Complaint to RAI and agreed not to serve process while the parties negotiated an amendment through which RAI and Paschal were given yet another opportunity to deliver a machine that would function as intended. In October 2008, after months of negotiations, the parties entered into the Amended Agreement Relating to Contract for Sale of High Pressure Washer (the "Amendment"). A true and accurate copy of the Amendment, with exhibits, is attached hereto as Exhibit 5. The Amendment specifically references SBI's Virginia lawsuit. *See Id.* The Amendment allowed RAI and Paschal to avoid the breach of contract suit and, instead, gave them one more opportunity to build – albeit very belatedly – the machine they had promised SBI they would build.

The Amendment required that the Machine undergo a series of run-offs, i.e., performance tests, at RAI's Illinois facility, and if those run-offs were successful, another series of run-offs at SBI's facility in Altavista, Virginia. In addition to the run-offs, the Amendment also required that the automotive parts used during the run-offs would be subjected to cleanliness testing at SBI's facility in Virginia. *See generally, Id.* Although some problems occurred during the run-offs at RAI's facility, SBI agreed to allow the process to progress to the run-offs at SBI's facility. Ex. 4, Sherwood Aff., ¶ 7. The Machine failed all five run-offs at SBI's facility for numerous reasons. *Id.* at ¶ 8. SBI provided written notice of the failures to RAI, as well as samples of parts that failed inspection. *Id.*

To this day, the very large Machine is inside SBI's facility in Altavista, Virginia, fixed to the floor. *Id.* at ¶ 9; *see also*, Exhibit 6, Photographs of the Machine. Similarly, except for the

5

samples provided to RAI, the parts used to test the Machine are at the same facility in Virginia. Ex. 4, Sherwood Aff., ¶ 9.

### C. Before The Additional Testing Was Complete, RAI Filed Suit In Illinois Knowing That SBI Already Had Filed In Virginia

When RAI realized that SBI was dissatisfied with the Machine's performance, RAI dashed to the Keene County, Illinois, Circuit Court and filed this case on or about February 6, 2009 and served process on SBI's registered agent shortly thereafter. SBI removed the action to this Court on or about February 27, 2009. RAI filed suit in Illinois knowing that SBI filed suit in Virginia more than a year earlier and would pursue its remedies there. Therefore, RAI filed this case knowing that it would create, unnecessarily and at great expense, duplicative litigation.

Revealingly, RAI filed this case before SBI completed the cleanliness tests required by the Amendment. RAI clearly filed suit in Illinois in anticipation that SBI would pursue its Virginia lawsuit. SBI re-filed its Virginia suit[1] on or about February 23, 2009 and served process on RAI and Paschal on March 5, 2009. RAI and Paschal removed SBI's lawsuit to the U.S. District Court for the Western District of Virginia, Lynchburg Division, on or about March 23, 2009.

---

[1] Under Virginia law, SBI was required to serve process within one year of filing its Virginia suit. *See* Sup. Ct. Va. R. 3:5(e). SBI could not serve process within a year, however, because negotiating the Amendment and performing thereunder took longer than a year. Accordingly, to pursue its claims against RAI and Paschal, SBI was forced to nonsuit, i.e., voluntarily dismiss, its Virginia case and then re-file it. *Gilpin v. Joyce*, 257 Va. 579, 515 S.E.2d 124 (Va. 1999) (action not served within one year may be nonsuited and re-filed) (decided under predecessor to Rule 3:5(e)). SBI nonsuited its Virginia action on or about February 2, 2009, and re-filed on or about February 23, 2009. The refiled case is virtually identical to the original case, with the addition of allegations relating to the Amendment.

### III. Arguments and Authorities

#### A. Transfer Is Appropriate Under § 1404(A) If Venue Is Proper In The Transferee District, If Transfer Promotes Convenience, And If Transfer Serves The Interests Of Justice

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The purpose of § 1404(a) is "to prevent avoidable waste of time, energy and money, as well as to protect parties, witnesses and the public against inconvenience and expense." *Hess v. Gray,* 85 F.R.D. 15, 23 (N.D. Ill. 1979). By enacting this section, Congress intended to permit courts to grant transfers upon a "substantially" lesser showing of inconvenience than was needed for dismissal under the doctrine of forum *non conveniens*, which previously governed transfers. *Waites v. First Energy Leasing Corp.,* 605 F.Supp. 219, 221 (N.D. Ill. 1985) (citations omitted). Transfer under § 1404(a) is appropriate if: (1) venue is proper in both districts; (2) transfer promotes the convenience of the parties and witnesses; and (3) transfer is in the interests of justice. *Solaia Tech., Inc. v. Rockwell Automation, Inc.,* 2003 U.S. Dist. Lexis 15285, *5-6 (N.D. Ill. Sept. 2, 2003) (citing *Law Bulletin Publishing Co. v. LRP Publications, Inc.,* 992 F. Supp. 1014, 1017 (N.D. Ill. 1998)). Each of these factors weighs in favor of transfer to Virginia.

#### B. Venue Is Proper In The Western District Of Virginia

In this diversity action, venue is governed by 28 U.S.C. § 1391(a). *Schwarz v. Nat'l Van Lines, Inc.,* 317 F. Supp. 2d 829, 834 (N.D. Ill. 2004). Section 1391(a) provides, in pertinent part, that venue is proper in a judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(a)(2). Events occurring in the transferee forum are

"substantial" if they are "part of the historical predicate of the claim." *Schwarz*, 317 F. Supp. 2d at 834 (citation omitted).

The parties' Agreement was negotiated at SBI's facilities in Altavista, Virginia (Ex. 1, Letz Aff., ¶ 6), the Purchase Order was submitted by SBI from Altavista, Virginia (*Id.* at ¶ 7), the final run-off of the Machine occurred in Altavista, Virginia (Ex. 4, Sherwood Aff., ¶ 7), and all of the cleanliness testing for the Machine occurred in Altavista, Virginia (*Id.*). The events occurring in Altavista, Virginia are a part of the "historical predicate" of the parties' claims. *See, e.g., Schwarz*, 317 F. Supp. 2d at 834 (holding that substantial part of events occurred in Arizona because the subject contract was formed in Arizona, and because the contract was partially performed in Arizona). Altavista, Virginia is subsumed by Campbell County, Virginia, which falls within the Lynchburg Division of the United States District Court for the Western District of Virginia. Therefore, venue is proper in the Western District of Virginia, Lynchburg Division.

The Western District of Virginia also has jurisdiction over the parties, specifically, RAI. Personal jurisdiction involves a two-part analysis. First, Virginia's long-arm statute must authorize jurisdiction. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004). Second, the assertion of jurisdiction must comply with the constitutional requirements for due process. *Id.* The two inquiries are interrelated in this case, because the Virginia long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause. *See John G. Kolbe, Inc. v. Chromodern Chair Co.*, 211 Va. 736, 180 S.E.2d 664, 667 (1971) ("It is manifest that the purpose of Virginia's long arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in this State to the extent possible under the due process clause.").

Virginia's long-arm statute provides, in pertinent part, that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action

arising from the person's ... [t]ransacting any business in this Commonwealth ... [or c]ontracting to supply services or things in this Commonwealth ...." Va. Code § 8.01-328.1(1)(2). "A single act of business by a non-resident is sufficient to confer jurisdiction, provided that the act is significant and gives rise to the cause of action." *M/A-COM, Inc. v. Seoul Commtech Co.*, 2008 U.S. Dist. Lexis 8723, *6 (W.D. Va. Feb. 6, 2008) (citing *John G. Kolbe, Inc., supra*, 211 Va. at 740, 180 S.E.2d at 667). RAI's agents traveled to Virginia numerous times to negotiate the Agreement, to discuss performance under the Agreement, and to test the Machine, which RAI contracted to supply in Virginia. *See* Ex. 1, Letz Aff., ¶¶ 6, 8; Ex. 4, Sherwood Aff., ¶¶ 4, 7. RAI has also sent numerous communications to SBI in Virginia in connection with the Machine. RAI's contacts in Virginia relating to the Machine are numerous, significant and give rise to the parties' claims. Therefore, regardless of RAI's general contacts with Virginia, its specific contacts giving rise to this action are sufficient under Virginia's long-arm statute to confer personal jurisdiction. *See, e.g., M/A-COM, Inc.*, 2008 U.S. Dist. Lexis 8723 at *7 (holding that the defendant was subject to personal jurisdiction under Virginia's long-arm statute because the agreement for the sale of a data radio was negotiated in Virginia, the defendant's employees traveled to Virginia on several occasions to discuss and inspect the data radio, and the defendant sent numerous communications to the plaintiff's employees in Virginia).

### C. Transfer To The Western District Of Virginia Promotes Convenience

In addition to being proper venue under § 1391(a), the Western District of Virginia is also a more convenient forum for the parties and the witnesses. Analyzing convenience under § 1404(a) requires consideration of several factors, including: (1) the plaintiff's choice of forum; (2) the *situs* of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties. *Software for Moving, Inc.*

9

*v. La Rosa Del Monte Express, Inc., et al.*, 2007 U.S. Dist. Lexis 90958, *14 (N.D. Ill. December 7, 2007) (citation omitted). Each of these convenience factors weighs in favor of transfer.

1.   **RAI's Forum Shopping And Improper Anticipatory Filing Weighs In Favor Of Transfer**

A plaintiff's choice of forum is not dispositive, but ordinarily it is afforded some weight. *See Id.* at *14-15 (citations omitted). RAI's choice in this case deserves no deference, however, because SBI filed suit first in Virginia. *See Schwarz*, 317 F. Supp. 2d at 832-833 ("When two similar actions are filed, the general rule favors the forum of the first-filed suit.") (citations omitted); *Solaia Technology, Inc. v. Rockwell Automation, Inc., et al.*, 2003 U.S. Dist. Lexis 15285, *10 (N.D. Ill. September 2, 2003) ("[Defendant's] action was filed first, and it is therefore appropriate that [Plaintiff's] later-filed action should be transferred to the Eastern District of Wisconsin.").

RAI will ask this Court to ignore the suit that SBI filed in Virginia in 2007, which SBI agreed not to press while the parties were negotiating the Amendment and while RAI was trying to perform under the Amendment. When RAI realized that it was unable to produce the Machine as agreed despite the multiple opportunities that SBI offered, RAI sued SBI in Illinois before testing under the Amendment was even complete. Therefore, RAI's decision to file suit in Illinois clearly reflects forum shopping designed to evade the Virginia forum which SBI had chosen to resolve its dispute with RAI more than a year earlier. RAI's Illinois suit also "constitutes an improper anticipatory filing made under threat of an imminent suit and asserting the mirror-image of that suit in another district." *Schwarz*, 317 F. Supp. 2d at 833. Therefore, RAI's choice of forum weighs in favor of transfer to Virginia. *Cf. Id.* (holding that first-to-file rule was inapplicable because the defendant's choice of forum was motivated by forum shopping and constituted an improper anticipatory filing) (internal quotations omitted).

10

### 2. Virginia Is The *Situs* Of Material Events Underlying The Parties' Claims

The second factor considered in the convenience analysis is the *situs* of material events. *Software for Moving, Inc.*, 2007 U.S. Dist. Lexis 90958 at *14 (citation omitted). The events giving rise to the formation of the underlying agreement are clearly material, and although some of the negotiations were conducted by communications from and to different states, the initial face-to-face negotiations occurred in Virginia. Ex. 1, Letz Aff., ¶ 6. This fact weighs in favor of transfer. *See, e.g., Id.* at *15-16 (holding that *situs* of material events weighed in favor of transfer to New York because "the contractual relationship at the heart of this case was conceived in New York.").

The run-offs and cleanliness tests were key to the parties' contract because they determined whether the Machine performed as promised. Therefore, these run-offs and cleanliness tests are also material events. Run-offs occurred in both Virginia and Illinois, but the final run-off in Virginia is the most material because, as RAI notes, the results of that run-off determine whether RAI and Paschal satisfied their contractual obligations to SBI. *See* Compl., ¶¶ 19-21 (alleging that RAI "completed performance pursuant to the Agreement" after the Machine allegedly "successfully completed a run-off ... at [SBI's] facility in Virginia"); *see also Software for Moving, Inc.*, 2007 U.S. Dist. Lexis 90958 at *15 (holding that Illinois was the *situs* of material events because that was where the "*principal* material event" occurred) (emphasis added). Further, *all* of the cleanliness tests were performed in Virginia. Ex. 4, Sherwood Aff., ¶ 7. Therefore, Virginia is the *situs* of material events, including contract formation and testing, and this factor weighs in favor of transfer. *See, e.g., Santa's Best Craft, LLC v. Janning*, 2003 U.S. Dist. Lexis 11042, *9 (N.D. Ill. June 23, 2003) (holding that *situs* of material events was Ohio because more material events occurred in Ohio and "[t]he tests conducted by defendants,

upon which they rely for the truth of their statements, and which are at the heart of both pending cases, were conducted in defendant Janning's lab located in the Southern District of Ohio.").

### 3. Virginia Allows Easier Access To The Key Sources Of Proof

The third factor in the convenience analysis is the ease of access to sources of proof. *Software for Moving, Inc.,* 2007 U.S. Dist. Lexis 90958 at *14. Sources of proof in this case include documents, such as the parties' agreements and correspondence. SBI's documents are located at SBI's facility in Virginia, and RAI likely has documents at its facility in Illinois. What distinguishes Virginia from Illinois in the sources of proof analysis is the location of the key physical evidence, namely the Machine and the parts used to test it, all of which are located in Virginia. Ex. 4, Sherwood Aff., ¶ 9. The location of the Machine is significant because it certainly will need to be examined by lay and expert witnesses, and a jury view of the Machine and a visit to SBI's facility is likely to be necessary to adequately educate the jury regarding the Machine, its role in SBI's operations, and the reasons for its failure. Transporting the Machine would be difficult and expensive given its size. *Id.*; *see also*, Ex. 6, Pictures of the Machine.

Moreover, disassembling the Machine and transporting it to Illinois would risk altering the state of the evidence and impeding both parties' ability to prove their respective cases. After the Machine was disassembled and transported to Virginia, significant additional defects appeared, strongly suggesting that the Machine's performance would be altered yet again if it were disassembled and transported again. Therefore, regardless of whether a jury view will be warranted, the inspection of the Machine during this case will need to occur in Virginia. The parts used to test the Machine's cleaning capabilities also are located in Virginia. Ex. 4, Sherwood Aff., ¶ 9. Therefore, because the key physical evidence is located in Virginia, the ease of access to sources of proof weighs heavily in favor of transfer to Virginia.

    **4.**    <u>**Virginia Is A More Convenient Forum For The Witnesses**</u>

The fourth factor in the convenience analysis is the convenience of non-party witnesses. *Software for Moving, Inc.,* 2007 U.S. Dist. Lexis 90958 at *14. One material non-party witness is Helms, Paschal's Metal Finishing and Cleaning Sales representative, though other Paschal representatives may have knowledge of material facts. Helms recommended RAI to SBI and brought RAI's President, Arbizzani, to Virginia in 2006 to meet with SBI and negotiate the agreement. Ex. 1, Letz Aff., ¶¶ 5-6. The Purchase Order was sent to Helms, and Helms executed the Amendment on Paschal's behalf. *Id.* at ¶ 7; Ex. 5, the Amendment. Further, Helms was involved with and has knowledge of the run-offs and testing performed pursuant to the Amendment. In sum, Helms has personal knowledge of SBI's purpose for obtaining the Machine, SBI's specifications for the Machine, including how those specifications were communicated to RAI, and the Machine's performance during run-offs and cleanliness tests. Hence, Helms is a material, non-party witness.

Paschal is a named defendant in SBI's Virginia lawsuit, and its interests are clearly aligned with RAI and adverse to SBI. Accordingly, Paschal and Helms are not likely to concede any point that may be detrimental to RAI's positions in this action. Nevertheless, it is indisputable that Paschal and Helms are located in Asheboro, North Carolina, which is substantially closer to Lynchburg, Virginia than it is to Chicago, Illinois. According to Paschal's web site, Paschal "services much of the Southeast including the Carolinas, Virginia, Georgia and Tennessee." Ex. 2, Excerpts from Paschal's Website. Given Paschal's and Helms' close proximity to Virginia and distance from Illinois, combined with their routine and pervasive contacts with Virginia, Virginia is a more convenient forum for Helms, as well as any other Paschal representative with knowledge of material facts.

13

In addition to Helms, SBI has identified two of its former engineers who were involved in the initial negotiations and approval of RAI's schematic designs for the Machine. Ex. 1, Letz Aff., ¶ 10. These individuals are believed to be living in Virginia and North Carolina. *Id.* As with Helms, it is axiomatic that Virginia will be a more convenient forum for these non-party witnesses. Therefore, this factor weighs in favor of transfer.

### 5. Virginia Is A More Convenient Forum For Party Witnesses

The final factor considered in the convenience analysis is the convenience of party witnesses. *Software for Moving, Inc.,* 2007 U.S. Dist. Lexis 90958 at *14. Acquiring a machine capable of cleaning automotive parts was an especially important business strategy for SBI, and as a result, numerous SBI employees were involved in the transaction and have personal knowledge of material facts that go to the heart of this dispute. SBI has already identified no fewer than 16 employees who were significantly involved with various phases of the underlying transaction and dispute, including the face-to-face negotiations, the Machine's performance during the several run-offs, and the cleanliness tests and inspections. The individuals identified thus far include:

| | |
|---|---|
| Keith Letz – involved in initial face-to-face negotiations (*see generally*, Ex. 1, Letz Aff.) | David Berg – witness to face-to-face discussions and Vice President in charge of purchasing (Ex. 4, Sherwood Aff., ¶ 4) |
| Rodney Bryant – submitted the purchase order that forms the Agreement (*Id.* at ¶ 7) | Wayne Tucker – maintenance supervisor involved with unloading and installing the Machine in Virginia (*Id.* at ¶ 7) |
| Douglas Sherwood – project manager, witness to numerous run-offs, and witness to face-to-face discussions (*see generally*, Ex. 4, Sherwood Aff.) | Bruce Boyd – testing (inspection) of Parts cleaned by the Machine (*Id.*) |
| Randall Pruitt – witness to numerous run-offs and the engineer who would be responsible for the Machine once it was | Edd Shelton – testing (inspection) of Parts cleaned by the Machine (*Id.*) |

14

| | |
|---|---|
| delivered to SBI in Virginia (*Id.* at ¶¶ 3, 7) | |
| Glen Lowe – witness to numerous run-offs and the equipment operator who would be responsible for operating the Machine (*Id.* at ¶¶ 3, 7) | Ben Rieley – testing (cleanliness) of Parts cleaned by the Machine (*Id.*) |
| David Stinnett – witness to numerous run-offs and the maintenance fitter who would be responsible for servicing the Machine (*Id.* at ¶¶ 3, 7) | Jim Abbott – testing (cleanliness) of Parts cleaned by the Machine (*Id.*) |
| Robert McCorkle – witness to face-to-face discussions and controller responsible for this significant capital expenditure (*Id.* at ¶ 4) | Helen Marsh – testing (inspection) of Parts cleaned by the Machine (*Id.*) |
| Kersi Dordi – witness to face-to-face discussions and plant manager (*Id.*) | Joyce Berger – testing (inspection) of Parts cleaned by the Machine (*Id.*). |

The testimony of these individuals is material. Further, the allegations in RAI's Complaint indicate that RAI's recollection of key events differs from SBI's employees' recollection, making it even more likely that testimony from all SBI witnesses will be needed.

Each of SBI's employee witnesses resides and works in Virginia and will be significantly inconvenienced if forced to travel to Illinois for discovery and trial. Further, SBI will be greatly inconvenienced if so many of its vital employees are forced to miss work traveling to Illinois for discovery and trial. In contrast to SBI, RAI did not perform any of the cleanliness testing. Hence, RAI necessarily has fewer material witnesses than SBI. Therefore, Virginia is a more convenient forum for the parties.

### D. Transfer To Virginia Serves The Interests Of Justice

The final consideration under § 1404(a) is whether transfer is in the interests of justice. *Solaia Tech., Inc., supra*, 2003 U.S. Dist. Lexis 15285 at *5-6 (citation omitted). The interests of justice prong, sometimes referred to as the "public interest factors," typically concern "the efficient administration of the court system." *Software for Moving, Inc.*, 2007 U.S. Dist. Lexis 90958 at *17 (citation omitted). Public interest factors include: (i) the relation of the community to the occurrence at issue in the litigation and the desirability of resolving the controversies in their locale; (ii) the court's familiarity with the applicable law; and (iii) the congestion of respective court dockets and the prospect for earlier trial. *Id.*; *Santa's Best Craft, LLC v. Janning*, 2003 U.S. Dist. Lexis 11042, *11 (N.D. Ill. June 23, 2003) (citation omitted). The second factor, familiarity with the applicable law, is irrelevant in this case. Regardless of which state's law applies, both parties have asserted contract claims, and contract law "tends to be more universal in its principles than most areas of substantive law, so that [a Virginia] federal judge is unlikely to encounter any real difficulty in researching and applying the Illinois doctrines that will be involved here." *Riviera Fin. v. Trucking Servs.*, 904 F. Supp. 837, 840 (N.D. Ill. 1995). The two other factors, however, weigh in favor transfer to Virginia.

As discussed above, Virginia is the *situs* of material events. Accordingly, Virginia's interest in resolving this dispute is greater than Illinois' interest. Further, the median time interval from filing a case to trial in the Northern District of Illinois is 27.5 months. By contrast, the median time interval in the Western District of Virginia is just 17.5 months. *See* Exhibit 7, U.S. District Court – Judicial Caseload Profile. Ten months is a significant difference. *Compare Santa's Best Craft, LLC*, 2003 U.S. Dist. Lexis 11042 at *12 (finding that "three month difference is minimal"). Waiting an additional ten months for trial in Illinois is especially

16

significant in this case because the parties already have devoted a considerable amount of time to trying to resolve the underlying dispute, and RAI already convinced SBI to delay for over a year pursuing its claim by asking for another opportunity to deliver a functioning machine. Therefore, this factor weighs in favor of transfer to Virginia.

Perhaps even more important than the three public interest factors discussed above is the "efficient functioning of the court system." *Solaia Tech., Inc., supra*, 2003 U.S. Dist. Lexis 15285 at *8 (citing *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220-221 (7th Cir. 1986)). Duplicative litigation is inefficient because it creates a "significant risk that the separate trial of these two cases could lead to inconsistent results and inconsistent decrees." *Id.* at *9. Duplicative litigation also obstructs the ability to consolidate discovery efforts and settlement negotiations. *Id.* at *9-10. Hence, as this Court observed in *Solaia Tech.*, if a later-filed lawsuit can be consolidated with an earlier-filed action, such consolidation is "dispositive," and the later-filed action should be transferred. *Id.*

RAI's Illinois action is the mirror image of SBI's Virginia action and thus can be consolidated with SBI's Virginia action pursuant to Fed. R. Civ. P. 42(a). SBI's Virginia action was filed first. Therefore, consistent with *Solaia Tech.*, and to promote "the efficient functioning of the court system," this matter should be transferred to the Western District of Virginia, Lynchburg Division, and consolidated with SBI's existing action. *See Id.* ("[Defendant's] action was filed first, and it is therefore appropriate that [Plaintiff's] later-filed action should be transferred to the Eastern District of Wisconsin.").

Respectfully submitted,

SCHRADER-BRIDGEPORT
INTERNATIONAL, INC.

By counsel

/s/ Thomas J. Lyman
Thomas J. Lyman, III
SMITHAMUNDSEN, LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
Phone: (312) 894-3241
Facsimile: (312) 894-3210

**Of Counsel:**

Michael W. Smith (VSB No. 01125)
Roman Lifson (VSB No. 43714)
David B. Lacy (VSB No. 71177)
CHRISTIAN & BARTON, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Phone: (804) 697-4100
Facsimile: (804) 697-4112

*Counsel for Defendant and Counterclaim-Plaintiff*

## CERTIFICATE OF SERVICE

    I hereby certify that on the 26th day of March, 2009, the foregoing *Memorandum* was electronically filed with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

>Patrick Christopher Keeley
>Piccione, Keeley & Associates
>122 South County Farm Road
>Wheaton , IL 60187
>
>*Counsel for Plaintiff and Counterclaim-Defendant*

_____/s/ Thomas J. Lyman_____
Counsel

#929900